TAX COURT OF NEW JERSEY



**CHRISTINE NUGENT**
JUDGE

495 Martin Luther King Blvd.
Newark, New Jersey 07102
(609) 815-2922 Ext.54610
Fax: (609) 815-2923

August 25, 2023

Jill T. Sorger, Esq.
211 Gates Ave
Montclair, New Jersey 07042

Anthony D. Tancini, Esq.
Deputy Attorney General
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

>       Re:         Kodus Leasing, Inc. v. Director, Division of Taxation
>       Docket No.:   014517-2015

Dear Counsel:

This is the court's decision after trial of the within matter where Kodus Leasing, Inc. ("Kodus" or "taxpayer"), challenged an assessment issued by the Division of Taxation ("Division" or "defendant") under the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -55, ("SUT" or "Act").

Kodus is engaged in the used car business. Defendant initiated an audit based on taxpayer's filed tax returns on which Kodus reported deductions in the amount of $5,038,243 on total reported sales in the amount of $6,865,570, for 2009 through the third quarter of 2012. The auditor denied $1,000,000 of taxpayer's reported deductions and issued a Notice of Assessment Based on Final Audit Determination ("NOA") for unpaid sales tax.[1] Taxpayer filed an administrative protest to

---

[1] Taxpayer contends it received no advance notice of the audit and thereby had no opportunity to participate in the audit process.





the Division's Conference and Appeals Branch ("CAB") where the assessment was unchanged. A Final Determination issued by the Director of the Division affirmed the assessment.

Based on documentary proof and witness testimony, taxpayer posits that the deductions at issue did not represent retail sales, but rather the vehicles were sold for resale or to out-of-state purchasers and thereby exempt from sales tax. At trial taxpayer also argued that the "standard" of the review at audit and at CAB differ, and because the audit proceeded without taxpayer's opportunity to participate that should factor into the court's decision when considering the evidence. Per defendant, taxpayer failed to maintain adequate books and records for its business to support its allegations that the $1 million in the denied deductions represented tax exempt sales. After a review of the proofs and arguments in support of the parties' positions, the court finds no basis to disturb the final determination of defendant.

Procedural History

Per the Division's audit narrative, the auditor examined taxpayer's filed tax returns comprised of corporate business tax returns (CBT-100), SUT returns (ST-50), and sales and use tax "Master Cash Summary Prints." According to the CBT-100, taxpayer's business is listed as "Used Car – Wholesale," and the only corporate officer listed is Igor Borko who serves as the president of Kodus. Mr. Borko is taxpayer's sole employee. The audit period at issue for the sales tax is April 1, 2009, through September 30, 2012.[2]

---

[2] This is because taxpayer ceased filing ST-50s in the third quarter of 2012. Per the narrative, "[s]ince the auditor was unable to contact the taxpayer to start the audit, the CBT-100 returns could not be audited" so no assessment was made. Moreover, the narrative listed as "concessions" to taxpayer, no arbitrary or estimated Use Tax assessment on fixed assets or expenses.

In the narrative it was noted that, beginning in 2013, many attempts were made to notify taxpayer about the audit, including through telephone calls and certified letters sent to taxpayer's last known address in South Amboy, New Jersey, and to "taxpayer's only known home address in Brooklyn, New York." All certified letters sent were returned to defendant marked "Return to Sender," and "phone calls made to the business location were unanswered." The narrative further stated, "[h]aving exhausted all avenues in an effort to contact the taxpayer the auditor closed the audit case on 6/24/13." The auditor made an "Estimated" assessment of $70,000 in sales tax based on denial of "sales deductions." A Notice of Assessment Related to Final Audit Determination ("NOA") dated July 2, 2013, reflecting this amount, plus penalties and interest, was issued.

Taxpayer wrote a protest letter to CAB dated April 5, 2014, to challenge the SUT assessment. In the letter taxpayer advised that the NOA mailed by the Division was sent to the wrong address, even though taxpayer's address at Newfoundland, NJ, had remained the same for 20 years. In correspondence to taxpayer dated October 7, 2014, defendant acknowledged receipt of the protest.

Per the CAB Conference Report, defendant contacted taxpayer on March 12, 2015, to schedule an appeal conference. In a telephone call on March 27, 2015, the parties discussed what was needed and taxpayer advised of its intent to forward to defendant an Appointment of Taxpayer Representative form. Taxpayer returned the form to defendant, but it was only partially complete. No taxpayer information was provided. The section seeking taxpayer information (name, address, mailing address, tax ID number/social security number) was left entirely blank. In the section seeking information for the taxpayer representative a name was provided but not an address. A box for the representative's phone number, fax number and representative ID had been previously redacted, so it is unclear to the court what information taxpayer provided. The form is signed by

"president" and dated March 19, 2015.  Defendant called taxpayer to obtain a completed form and to schedule a conference.  Neither taxpayer nor taxpayer's representative responded or requested to meet with the conferee.   CAB set a date for a conference instead.

By letter dated April 6, 2015, taxpayer was advised that CAB scheduled a conference for May 5, 2015 "in accordance with the Division's acknowledgement letter of October 07, 2014" and taxpayer's "failure to respond to schedule (sic) a conference."  The letter advised that any need to reschedule would have to be addressed in writing.  It further advised taxpayer that documentation in support of its contention must be received by CAB either before or at the conference, to consist of: a listing of all non-taxable sales with VIN and purchaser that matches the amount shown on taxpayer's sales and use tax returns for the audit period, as well as underlying documentation for exemption for each sale deducted.

Per the report, at the scheduled conference no one appeared on taxpayer's behalf.  Instead, Mr. Borko appeared unscheduled at CAB on May 15, 2015, but the conferee was out of the office.  Defendant contacted taxpayer on May 19, 2015, and advised taxpayer to provide its documents to CAB on or before June 2, 2015.  The parties met and conducted a conference on June 5, 2015.  The conferee deemed the documents produced to be insufficient to support taxpayer's challenge and offered taxpayer the opportunity to provide any additional available documents.  In response, taxpayer produced a handful of additional business documents as well as TD bank statements for March, April, May, and June of 2011.  After administrative review the assessment remained unchanged.  Defendant issued a Final Determination dated August 11, 2015, affirming the tax

4

liability,[3] and taxpayer timely filed a complaint to Tax Court to appeal defendant's decision. Defendant filed a motion for summary judgment which was denied by this court.[4]

FACTS

Mr. Borko testified at trial on taxpayer's behalf. At trial, taxpayer produced approximately 73 business documents, as well as the following fourteen months of TD bank statements: November 2009, September and October 2010, January 2011, March through August 2011, November 2011, December 2011, January 2012, and April 2012. All were admitted into evidence without objection.[5] Defendant produced the conferee at trial along with documents related to the administrative appeal process all of which were admitted into evidence without objection.

Kodus began operations in 1999. As taxpayer's sole employee, Mr. Borko operates taxpayer's business alone. He explained that the nature of the business has changed over time. As the export market took hold taxpayer purchased vehicles for overseas customers. That testimony appeared to comport with taxpayer's position on motion for summary judgment where Mr. Borko

---

[3]

| Tax Type | Period | Tax Liability | Penalties* | Interest | Interest to Date | Total |
|----------|--------|---------------|-----------|----------|------------------|-------|
| Sales | Apr. 2009 to Sept. 2012 | $70,000.00 | $3,500.00 | $22,939.08 | 08/20/2015 | $96,439.08 |
| | Total | $70,000 | $3,500.00 | $22,939.08 | | $96,439.80 |

*Post-trial defendant waived the penalty.

[4] Defendant's summary judgment motion alleged that Kodus provided insufficient evidence regarding whether its sales were subject to SUT. Taxpayer argued that a material issue of fact existed based on taxpayer's documents and on Mr. Borko's certification that all vehicles sold by taxpayer were for resale and thereby excluded from the definition of "retail sale." N.J.S.A. 54:32B-2(e).

[5] At trial, taxpayer marked the business documents, in bulk, as exhibit one, and the bank statements as exhibit two.

certified "Kodus is <u>not</u> engaged in the retailing of motor vehicles in the State of New Jersey. Kodus purchases motor vehicles at auction and exports them to other motor vehicle dealers outside the State of New Jersey."

Marked as exhibit one, at trial taxpayer produced 73 business documents related to taxpayer's vehicle transactions during the audit period. Mr. Borko testified about one category of document called a reassignment form. According to the witness he prepared a reassignment form for each vehicle taxpayer sold, provided that the vehicle was to be registered in New Jersey. The witness testified about two additional forms related to the vehicles taxpayer bought or sold through auction. Lastly, taxpayer produced the fourteen months of TD bank statements that purported to show the sale of vehicles to overseas customers. According to Mr. Borko, he understood taxpayer was obligated to collect sales tax and remit it to the State whenever "taxpayer sold a car in New Jersey."

Within exhibit one taxpayer produced thirteen reassignment forms. The witness explained that as a dealer, taxpayer was required to purchase reassignment forms which are numbered and sold thirty to a book. The witness testified that during the audit period he filled out a form for each vehicle taxpayer sold, "unless it was sold for export overseas." For a vehicle to be registered in New Jersey, the dealer was required to prepare a reassignment form for presentation to the New Jersey Motor Vehicle Commission. The witness was asked about taxpayer's retention of the forms and the response was contradictory. He first said that he produced two reassignment books at the CAB on behalf of taxpayer, but later testified that he did not have the reassignment books for 2009 through 2012. Instead, he said he only had a few of the forms, and the others must have been lost. Each reassignment form had a section entitled "Sale Price," "Net Sale," and "Sales Tax Collected."

6

One or two of the forms produced at trial included a figure for sales tax and/or sale price, but on others the sections were either left blank or the figures were unreadable.

Mr. Borko testified that taxpayer bought and sold vehicles at auction and taxpayer included various documents related to those transactions as part of exhibit one. There were a variety of different vehicle forms, some readable and some unreadable. The witness explained in general terms that the documents represented the sales of vehicles to other dealers, and thereby non-taxable wholesale transactions. He did not offer testimony about every document produced or how it related to a vehicle sale. The testimony in that regard was spotty. Upon its review of exhibit one the court located documents that appear to correspond to twenty-four vehicle transactions taxpayer made through the Manheim auction house during the audit period.[6]

Among the exhibit one documents the witness testified about two different auction forms. The first form set out the buyer's name, VIN, model, vehicle make, a sale price and a column of ten or so categories of fees related to the vehicle transaction. The last number in the column read "net amount of check." The auction document was otherwise unidentified by the witness, so for the sake of clarity the court will refer to it as a vehicle summary sheet. While not every one of the twenty-four vehicles was documented through a vehicle summary sheet the court counted twenty-one vehicle summary sheets representing taxpayer's auction activity during the audit period.

Exhibit one contained a second auction document about which the witness offered testimony. It was affixed with the Manheim auction logo. The document was otherwise unidentified by the witness so the court will hereinafter refer to it as a Manheim receipt. Each

---

[6] Of the twenty-four auction vehicles documented the evidence shows one vehicle purchased by taxpayer at auction and twenty-three vehicles sold by taxpayer at auction.

receipt contained certain dollar figures, including "Selling Price," "Buyer's Fee," and a category called "Buy Net." Using the documents, the court sought to calculate taxpayer's total revenue if possible, however, the selling price on the Manheim receipt did not match the sales price on the corresponding summary sheet for any of the vehicles. Using a combination of the two document types the court calculated taxpayer's total revenue by using the "net" figure for the twenty-three documented sales which totaled $243,875.[7]

Besides the documentary evidence, the witness provided some testimony about the auction transactions themselves. Mr. Borko explained that there were instances when he might bring a car to auction to sell on a client's behalf. In that case, taxpayer would sell the car and receive a fee for its services. The witness described that kind of sale as "represent[ing]" a client at auction. This testimony arose when the witness was asked why some of the vehicle summary sheets contained handwritten numbers on them in addition to any of the printed figures that appeared. Defense counsel pointed the witness to one such document and the witness was unable to explain what the handwritten figures represented. The witness's explanation was confusing. In the column on the face of the document was listed the following: "Sale Price: 3,350; Selling Fee: 195.00; Net Amount of check: 3,155." The face of that document contained the number "3,000" handwritten and circled. Asked on cross examination what the circled number represented the witness testified he

---

[7] Taxpayer produced summary sheets for only twenty-one of the vehicles sold at auction, so the court used the net figure on the bottom of the Manheim receipt to calculate the revenue for the other two vehicles. Exhibit one also contained several checks written to taxpayer that accounted for four of the vehicles taxpayer sold at auction. Notably, the check amount matched the net check figure on four of the corresponding vehicle summary sheets. In defendant's post-trial brief, it contends that exhibit one shows twenty-six vehicle transactions at auction amounting to $297,540, rather than the total calculated by the court. There was no testimony regarding defendant's calculation.

did not remember but surmised "maybe I paid $3,000 for the car." Unsure what had transpired, he explained he might instead have represented a client on that sale, sold the car for $3,500 at the auction and the buyer told him to "keep $500 for myself, and I will cut the person a check for $3,000 . . . so I had to give them back $3,000 and the difference would be my company profit."[8] There was no testimony from the witness regarding the total amount of revenue taxpayer received from the auction sales during the audit period.

On direct examination the witness was asked to determine, based on the auction documents, what percentage of taxpayer's business was done through auction. The witness first said, "maybe 90%" then candidly stated that he did not know but said "most" of taxpayer's business was "wholesale and export." The witness then tacitly acknowledged that taxpayer engaged in retail sales. Mr. Borko was asked by taxpayer's attorney what percentage of taxpayer's transactions constituted "retail sales," the witness said he did not know.[9]

Lastly, the witness testified about the bank statements marked as exhibit two. Mr. Borko focused on several entries designated as "wire transfers" which represented money deposited to taxpayer's bank account. According to the witness, the wire transfers serve as proof of taxpayer's overseas vehicle sales. Based on the court's review of the bank statements the documents include

---

[8] Among the twenty-four fee sheets, fifteen had handwritten numbers on them with no explanation as to what the numbers represent.

[9] Per Schedule S-1 of the auditor's worksheet, taxpayer offset the reported gross sales by certain deductions which produced a sales tax liability for tax year 2009, and for the first, second and fourth quarters of tax year 2010. No tax was reported for the third quarter of 2010, tax year 2011, and the first three quarters of 2012. During that period the entire amount of the reported gross sales were offset by the identical amount of deductions. The reported gross sales for the audit period less the reported deductions provided the reported taxable sales of $1,827,227 ($6,865,570 - $5,038,243).

a total of eighteen incoming wire transfer entries. Each entry includes a dollar amount, date, and a name. The bank statements contain no information to identify the purpose of the wire transfer, such as a VIN, vehicle make or model, or any other indication that the deposit reflects proceeds from the sale of a vehicle. On cross-examination counsel asked the witness about five of the wire transfer transactions and the witness recalled the details to three of those five. The three transactions involved a Russian buyer who purchased a total of three vehicles. The witness otherwise testified, generally, that "all" the wire transfers were payment for vehicles taxpayer sold outside of New Jersey and that most were likely sold and exported out of the country.

Mr. Borko was asked on cross-examination if he obtained exemption certificates from customers, particularly, Taxation Form ST-3 (sale for resale) and/or Taxation Form ST-10 (Motor Vehicle Sales and Use Tax Exemption Report), to represent taxpayer's sales exempt from New Jersey sales tax. In response, the witness requested that the State attorney show him an example of an exemption certificate, but the attorney did not. Mr. Borko was candid in his response that he has no familiarity with the exemption forms, taxpayer has never used them and until the trial the witness had been unaware of any obligation to use them.

Taxpayer's lawyer asked the witness to describe taxpayer's record keeping. The witness said, "I kept everything I could." Asked whether taxpayer kept copies of his records of every vehicle sale, Mr. Borko testified "I brought what I had." The witness was clear in his testimony that he did not prepare or maintain lists of the vehicles sold by taxpayer with identifying numbers, make, model and buyer name. The witness testified vaguely about an event in 2011 he said impacted taxpayer's records. While the witness explained he did not have a good memory of the event, he recalled that a flood or hurricane may have destroyed some documents, or at least

rendered some unreadable.  He explained that "whatever I brought to court, whatever I gave the Division, is all I have."

The conferee testified about CAB review.  Upon review of taxpayer's documents the conferee determined that for the second quarter of 2011, the ST-50 showed $1,084,975 in sales, and deductions in the same amount.  For that same period taxpayer's documents revealed $132,500 in deductions exempt from tax and the bank statements revealed deposits of $800,576.  Per the conferee taxpayer failed to provide documentation that all the sales for the quarter were deductible.  She then applied her analysis to the full audit period consisting of fourteen quarters and concluded that taxpayer did not support that all sales for the audit period were deductible.  The conferee concluded that taxpayer's taxable sales would have well exceeded the additional $1,000,000 defendant assessed and well more than the $70,000 in sales tax assessed for the audit period.

ANALYSIS

Pursuant to statute, "[t]here is imposed and there shall be paid a tax…upon: (a) [t]he receipts from every retail sale of tangible personal property . . . ."  N.J.S.A. 54:32B-3(a).  A "retail sale" as defined in N.J.S.A. 54:32B-2(e), "means any sale, lease, or rental for any purpose, other than for resale, sublease, or subrent."  Ibid.  Per N.J.S.A. 54:32B-12(a), one required to collect the tax is obligated to do so when collecting the price of the goods sold at retail.  That individual is designated as a State "trustee for and on account of the State."  Ibid.  The trustee is personally liable for the tax.  N.J.S.A. 54:32B-14(a).

A presumption exists that the sale of tangible personal property is taxable unless the person required to collect the tax can demonstrate otherwise.  N.J.S.A. 54:32B-12(b).  See also Hospital Portrait Svc. v. Dir., Div. of Taxation, 6 N.J. Tax 305, 314 (Tax 1983), aff'd o.b. 7 N.J. Tax 431 (App. Div. 1984).  Thereby, a taxpayer is exempt from SUT if the taxpayer can prove that a

11

transaction at issue is not a retail sale, but rather is a sublease or resale, for instance through use of a resale certificate, Form ST-3. See N.J.A.C. 18:24-1.1.

Pursuant to N.J.S.A. 54:32B-10(a), "receipts from any sale of a motor vehicle" (and "aircraft, boat, vessel") are exempt if "at the time of taking delivery," the purchaser:

> (1) is a nonresident of this State,
> (2) has no permanent place of abode in this State,
> (3) is not engaged in carrying on in this State any employment, trade, business or profession in which the motor vehicle . . . will be used in this State,
> (4) prior to taking delivery, furnishes to the seller: any affidavit, statement or additional evidence, documentary or otherwise, which the director may require to assure proper administration of the tax imposed upon subsection (a) of section 3, and
> (5)[10]
>
> [Ibid.]

Form ST-10, Motor Vehicle Sales and Use Tax Exemption Report, collects the information required to meet the motor vehicle exemption under N.J.S.A. 54:32B-10(a) and is used to report the sales tax exemption to the Division. See N.J.A.C. 18:24-1.1.

Tax exemptions are narrowly construed against the claimant. Int'l Sch. Servs., Inc. v. West Windsor Twp., 207 N.J. 3, 15 (2011) ("a statute granting exemption from property taxation . . . is subject to strict construction"); Ronson Corp. v. Dir., Div. of Taxation, 22 N.J. Tax 652, 656 (App. Div. 2005) ("exclusions and deductions are matters of legislative grace which must be strictly construed against the claimant"). "One who claims exemption must bring himself clearly within the exemption provisions." Container Ring v. Dir., Div. of Taxation, 1 N.J. Tax 203, 208 (Tax 1980), aff'd o.b. 4 N.J. Tax 527 (App. Div. 1981).

---

[10] Section (5) only applies to "aircraft, boat or other vessel."

A taxpayer required to collect and remit sales tax is obligated to maintain records of its sales. The relevant statute reads:

> Every person required to collect any tax imposed by this act shall keep records of every purchase, purchase for lease, sale or amusement charge or occupancy and of all amounts paid, charged or due thereon and of the tax payable thereon, in such form as the director may by regulation require. Such records shall include a true copy of each sales slip, invoice, receipt, statement or memorandum upon which subsection (a) of section 12 [C.54:32B-12] requires that the tax be stated separately. Such records shall be available for inspection and examination at any time upon demand by the director or his duly authorized agent or employee and shall be preserved for a period of four years, except that the director may consent to their destruction within that period or may require that they be kept longer.
>
> [N.J.S.A. 54:32B-16.]

Defendant is responsible for the administration and collection of SUT under the Act. N.J.S.A. 54:32B-24. Under N.J.S.A. 54:32B-24(5), the Director of the Division is authorized to "require any person required to collect tax to keep detailed records of all receipts . . . charged or accrued, including those claimed to be nontaxable, and also of the nature, type, value and amount of all purchases, sales, services rendered . . . and to furnish such information upon request of the director." Ibid. The Director is also authorized and empowered to "prescribe methods for determining the amount of receipt . . . and for determining which of them are taxable and which are nontaxable." N.J.S.A. 54:32B-24(4).

At the time of the audit N.J.A.C. 18:24-2.4 provided:

> (a) Where summary records are maintained which show, by sales location, total receipts and taxable receipts, the vendor may dispose of individual sales slips, invoices, receipts, statements, memoranda of price, or cash register tapes, except as provided in Section 2.5 (Resale and exemption certificates), 2.6 (Out-of-State sales) and 2.8 (Purchase records), of this Chapter, after the lapse of a period not less than 90 days from the last date of the

most recent quarterly (or monthly) period for the filing of sales tax returns to which such individual sales documents pertain.

(b) In all instances, summary sales records as described herein shall be retained for a period not less than four years from the last date of the quarterly (or monthly) period for the filing of sales tax returns to which summary records pertain.

[N.J.A.C. 18:24-2.4(a), (b).][11]

Per the SUT regulations, retailers must maintain all purchase invoices for a period of four years. N.J.A.C. 18:24-2.8 (seller must maintain invoices showing the names and addresses of persons from whom purchases were made, the amounts of all purchases, the dates upon which all purchases were made and the nature of the items purchased).

Defendant is empowered to determine the tax due where either, a return is not filed, or if a return is filed, it is incorrect or insufficient. N.J.S.A. 54:32B-19. In that event "the amount of tax due shall be determined by the director from such information as may be available." Ibid. See also Ridolfi, t/a Hub Bar v. Dir., Div. of Taxation, 1 N.J. Tax 198, 203 (Tax 1980); Yilmaz, Inc. v. Dir., Div. of Taxation, 22 N.J. Tax 204, 230 (Tax 2005), aff'd, 390 N.J. Super. 435, 441 (App. Div. 2007) (the Director is vested with the "broad authority to determine the tax from any available information, and, if necessary, to estimate the tax from external indices.").

At trial taxpayer produced scant books and records. Taxpayer was unable to present documentation to support all of taxpayer's sales and claimed exemptions for the audit period. Taxpayer produced auction documents as proof of nontaxable transactions of some twenty plus

---

[11] Effective May 16, 2016, the Director amended N.J.A.C. 18:24-2.4. The amendments replaced "may dispose of" with "must maintain" individual sales slips, invoices, receipts, statements, memoranda of price, or cash register tapes in N.J.A.C. 18:24-2.4(a). 47 N.J.R. 2919(a), (December 7, 2015). The amendments also changed the 90-day period to four years in N.J.A.C. 18:24-2.4(a) and deleted the phrase (or monthly) in N.J.A.C. 18:24-2.4(a), (b). Ibid. Lastly, the amendments also deleted the three cross-references to Sections 2.5, 2.6, and 2.8 in N.J.A.C. 18:24-2.4(a) as they were no longer necessary. Ibid.

vehicles it sold to dealers during the audit period for the total amount of, at best, $243,875, (using the court's calculation).[12] Because the figures on the corresponding vehicle documents differed, the evidence was ineffective proof of the actual revenue taxpayer obtained from the auction sales. Handwritten calculations on the forms cast further doubt as to the amount of revenue generated by taxpayer from the transactions. Credible evidence of the dollar amount of taxpayer's revenue, and the total of exempt sales represented by the documents, is thereby lacking.

Taxpayer also produced TD bank statements as proof of wire transfers; non-taxable sales taxpayer testified represent sales to overseas purchasers. The court finds that the bank statement entries similarly lack the reliability to be considered as proof of exempt sales. The only information on each bank statement was the dollar amount of the wired sum, and a name, purportedly the buyer's name. The witness did not testify about each transaction, the location of each buyer at the time of purchase, etc. Moreover, the bank statements added none of the required facts since the documents lack information to prove the purpose of the deposits. The wire transfers are unsupported by any documentation, e.g., shipping documents associated with each vehicle, the description of the vehicle, the date of transfer, the dollar amount of the transaction, whether the amount of the wire represented revenue to taxpayer, etc., to support the fact that the wire transfers represent taxpayer's revenue from the sale of vehicles shipped overseas.

Taxpayer did not produce other documentation showing that the sales were exempt such as by providing appropriate exemption or resale certificates matching the amount shown on the sales and use tax returns. The witness acknowledged that taxpayer failed to maintain such certificates and explained that he had no understanding or knowledge about their use. It was not

---

[12] Even assuming defendant's figure is correct, $297,540, it would only support that taxpayer is unable to substantiate the dollar amount of exemptions claimed.

taxpayer's practice to keep lists of its sales, taxable or non-taxable, to identify the VIN, purchaser, price, and the like, which might provide proof of sales in summary form.

The only other documents the witness testified about were the New Jersey motor vehicle reassignment forms. Information on the thirteen forms produced at trial was ineffective proof of the taxpayer's sales revenue. Beyond those documents, taxpayer never identified any of the other 73 business documents produced as constituting proof of either taxable or non-taxable sales. The court is unable to infer that taxpayer should be credited with any additional revenue, or SUT exemption, based on those remaining documents absent credible testimony to that effect. In viewing the documentary evidence, at best the auction sales accounted for $243,875 for the entire audit period. Similarly, the wire transfers total roughly $900,000 over the audit period. The two figures combined falls well-short of taxpayer's claimed exemption in the amount of $5,038,243.

Kodus posits that this court should consider the totality of the evidence presented and find that taxpayer sufficiently proved the assessment is incorrect in reliance on Saulwil, Inc. v. Dir., Div. of Taxation, 31 N.J. Tax 433 (Tax 2020). Per the taxpayer, in the spirit of Saulwil the court should consider Mr. Borko's testimony to conclude that taxpayer is not liable for the assessed tax for simply failing to keep adequate books and records.

In Saulwil, the court found that the taxpayer maintained adequate books and records and the Division was incorrect to employ an estimated markup methodology in assessing the taxpayer's sales and use tax liability. Id. at 436. The taxpayer in Saulwil provided the Division with daily and monthly sales summaries generated by the point-of-sales software program located in the taxpayer's restaurant, which summary information the Division rejected on the basis that it was "useless without cash register tapes or guest checks to verify the totals contained in the summaries." Id. at 438. The Division reconstructed the taxpayer's gross receipts by computing a

higher markup of 3.92% overall, using the taxpayer's purchases for a two-week period within the audit period.  Ibid.

The court found the lack of cash register tapes ("an undefined phrase vis-à-vis a POS software program") was not fatal to the taxpayer's case.  Id. at 449.  Ruling in favor of the taxpayer, the court found that the Division's "determination to estimate a markup percentage and inflate the reported receipts was unnecessary and unsupported" by statute.  Id. at 449.  "Whether a taxpayer's records are 'inadequate' depends on the facts and circumstances of each case.  It is not necessarily the quantity of records, but also the quality."  Ibid.  Additionally, "a taxpayer need not maintain the best or perfect records," but rather its records "should be sufficient (sic) enough to support the veracity of its filed returns."  Ibid.  In addition to the credible testimony the taxpayer provided, the taxpayer's sales summaries served as "actual contemporaneous records for the audit period and provided a cumulative running total of all sales each day."  Id. at 450.  Those records served as "the best evidence in computing tax."  Ibid.

In its analysis this court considered the testimony of Mr. Borko and finds that the case at hand is distinguishable from Saulwil.  The taxpayer in Saulwil provided the Division with comprehensive contemporaneous records for the audit period, which documented a running total of all sales each day.  The discrepancies between the taxpayer's monthly summaries and the journals it maintained were minor.  To the contrary, Kodus was unable to provide documentary proof of its total sales during the audit period or the total exempt sales transacted either through purchase and sales records, through sales summaries, or through use of tax-exempt certificates.  The witness testimony was also lacking in that regard.  The witness testified largely in generalities unsupported by adequate, reliable, documentary evidence.  Unlike in Saulwil, here the Division was not presented with the "best evidence in computing tax."  The evidence before this court

17

supports the fact that taxpayer maintained inadequate books and records for the audit period at issue. The lack of adequate books and records left defendant no option but to resort to other evidence to approximate the SUT due for the audit period.

The Division's assessment carries a presumption of correctness. Atlantic City Transport. Co. v. Dir., Div. of Taxation, 12 N.J. 130, 146 (1953); Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105 (1952). "[T]he presumption that the Director's assessment is correct can be rebutted only by cogent evidence that must be 'definite, positive and certain in quality and quantity to overcome the presumption.'" Yilmaz, Inc. v. Dir., Div. of Taxation, 22 N.J. Tax at 236. The evidence must "focus on the reasonableness of the underlying data used by the Director and the reasonableness of the methodology used." Ibid. "An 'aberrant' methodology will overcome the presumption of correctness"; while "an imperfect methodology will not." Ibid. "In the absence of evidence that the amount of the assessment is 'far wide of the mark,' the taxpayer cannot overcome the presumption simply by attacking the Director's methodology." Yilmaz, 390 N.J. Super. at 441.

This case more approximates the facts set out in Yilmaz, rather than in Saulwil. In Yilmaz, the defendant's audit of the taxpayer's tax returns revealed discrepancies between the SUT and CBT returns. 22 N.J. Tax at 216. The taxpayer did not maintain a general ledger, a purchase journal, guest checks or register tapes. Yilmaz, 22 N.J. Tax at 213. Invoices for cash payouts were kept only a short period of time then thrown away. Ibid. The only documents retained by the taxpayer that had any relation to gross receipts were bank statements showing deposits into its bank accounts. Id. at 216. The Tax Court reiterated the statutory obligation of the taxpayer "to maintain records and make them available to the Director." Id. at 235. The trial court upheld the assessment and rejected the taxpayer's assertions that the assessment was unreasonable. Id. at 237.

18

"The 'naked assertions' of the taxpayer, without supporting records or documentation, are insufficient to rebut the presumption that the Director's assessment is correct." Id. at 231 (internal citations omitted). The appellate court affirmed the trial court, finding that it "appropriately rejected plaintiff's suggestion that the onus should be on the Director to establish that it used 'the most reasonable means available' or 'the best possible method' to estimate the taxpayer's receipts." Yilmaz, 390 N.J. Super. at 441.

Kodus additionally argues that it did not receive proper notice of the audit, and so was left without the opportunity to present the necessary books and records to support the exempt sales. Taxpayer posits that it was harmed by the inability to participate in the audit process, and that the audit essentially constitutes a "different standard" than the CAB review where taxpayer may have had the opportunity to meet with the auditor at taxpayer's place of business to facilitate production of its records. The court finds taxpayer's position to be unavailing. The evidence shows that at least one of the addresses used by the auditor to alert taxpayer to the audit was an address used by taxpayer during the audit period. In the 2014 protest letter taxpayer contends it maintained the Newfoundland, NJ, business address for over 20 years. However, in addition to the Newfoundland address, the TD bank statements list taxpayer's address in South Amboy, one of the addresses the auditor cites in the audit narrative used to send taxpayer certified mail. That serves as unrefuted proof that taxpayer did maintain an alternate address during the relevant time, and an address apparently used by defendant in its attempts to notify taxpayer about the audit.

Notwithstanding any confusion in notice to taxpayer, there is insufficient evidence to show that taxpayer's absence during the audit made a difference. Taxpayer's own testimony belies the fact that taxpayer maintained adequate books and records, or records of the exempt sales claimed in the tax returns. The fact that taxpayer was provided multiple opportunities to provide documents

19

to the Division made no difference to the documents produced. Even acknowledging that some unidentified records may have been destroyed by a flood, there is no testimony to support a finding that taxpayer ever maintained adequate books and records.

At trial in this case, the witness testimony contributed little more than "naked assertions," in the face of evidence that was scant, and at times both confusing and contradictory. Taxpayer's proofs failed to sufficiently support the veracity of its tax returns to serve as the cogent evidence required to overcome the presumptive correctness of the Director's determination. The evidence fails to support taxpayer's claims that the $1,000,000 taxed sales (denied as a deduction from gross sales by the Division) represented tax exempt sales, either as resales or as sales made to out-of-state purchasers.

For the above reasons, the court finds that taxpayer has not provided sufficient proofs to disturb the Division's final determination. Therefore, the final determination stands, and the complaint is dismissed.

Very truly yours,

Christine Nugent, J.T.C. /s/